UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────

EDISON FUND; FAIRFAX FUND; ESSEX FUND;
NUCLEUS FUND; OXFORD FUND; SANTA
BARBARA II FUND; SHAKTI FUND; and          06 Civ. 4045 (JGK)
SAGITARIUS FUND,

                                                    OPINION
                    Plaintiffs,                    AND ORDER

          - against -

COGENT INVESTMENT STRATEGIES FUND,
LTD.; COGENT ASSET MANAGEMENT, LLC;
CENTRIX FUNDS, LLC; CENTRIX CAPITAL
MANAGEMENT, LLC; and CLARK GATES,

                    Defendants.
─────────────────────────────────

JOHN G. KOELTL, District Judge:

     This action involves allegations of securities fraud based

on the inability of certain funds to redeem participants'

investments after the market for managed portfolios of sub-prime

automobile finance loans deteriorated.  The plaintiffs, a

variety of investment companies who are alleged to have invested

in two different funds managed by the defendants, brought this

action to recover money they allegedly lost as a result of

representations the defendants made about the liquidity of their

investments.

     The plaintiffs assert a federal claim for securities fraud

under Section 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17

C.F.R. § 240.10b-5, a controlling person liability claim under

Section 20(b) of the Act, 15 U.S.C. § 78t, and state law claims
for fraud and gross negligence.  The defendants have moved to
dismiss the entire Amended Complaint pursuant to Federal Rule of
Civil Procedure 12(b)(6) for failure to state a claim upon which
relief can be granted and, pursuant to Federal Rule of Civil
Procedure 12(b)(1), for lack of subject matter jurisdiction over
the state law claims or, in the alternative, dismissal of the
state claims for failure to state a claim.  The motion is
**granted in part** and **denied in part** for the reasons discussed
below.

**I.**

**A.**

On a motion to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(6), the allegations in the Complaint are
accepted as true.  Grandon v. Merrill Lynch & Co., 147 F.3d 184,
188 (2d Cir. 1998).  In deciding a motion to dismiss, all
reasonable inferences must be drawn in the plaintiffs' favor.
Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.
1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  The
Court's function on a motion to dismiss is "not to weigh the
evidence that might be presented at trial but merely to
determine whether the complaint itself is legally sufficient."
Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  The
Court should not dismiss the complaint if the plaintiff has

2

stated "enough facts to state a claim to relief that is plausible on its face." Twombly v. Bell Atlantic Corp., 127 S. Ct. 1955, 1974 (2007); see also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, the Court is not required to accept legal conclusions asserted in the Complaint. See Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002); Barile v. City of Hartford, 386 F. Supp. 2d 53, 54 (D. Conn. 2005).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the Complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Taylor v. Vermont Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002); Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991); VTech Holdings Ltd. v. Lucent Techs., Inc., 172 F. Supp. 2d 435, 437 (S.D.N.Y. 2001).

**B.**

For the purposes of this motion to dismiss, the allegations
in the Amended Complaint are accepted as true and certain
documents referenced in the Amended Complaint are also
considered.[1]  The following summary of the background facts is
drawn from those documents.

The plaintiffs, Edison Fund, Fairfax Fund, Essex Fund,
Nucleus Fund, Oxford Fund, Santa Barbara II Fund, Shakti Fund,
and Sagitarius Fund, are all limited liability investment
companies organized and operating in the Grand Cayman Islands.
(Am. Compl. ¶¶ 15-22.)  The defendants include several companies
alleged to be involved in the management or offering of two
funds whose investment strategies focused on managed portfolios
of insured sub-prime automobile finance loans.  (See id. ¶¶ 23-
27.)

The defendant Centrix Funds, LLC, is a Delaware multi-
series limited liability company.  The Centrix Loan

---

[1]  The Amended Complaint plainly relies upon the offering materials for both
the Leveraged and Non-Leveraged Funds as the bases for alleging
misrepresentations, as well as letters issued by the Nation Credit Union
Association ("NCUA").  Additionally, it relies upon testimony by Robert
Sutton, the chairman and CEO of Defendant Centrix Capital Management, who
testified at a Section 341 Meeting of Creditors on October 30, 2006 in the
Chapter 11 bankruptcy of Centrix Financial.  Because the Amended Complaint
relies upon these materials as the sole factual support for alleging material
omissions, these documents are integral to the Complaint and the Court will
consider them for the purposes of this motion to dismiss.  See Chambers, 282
F.3d at 153.  The Complaint also directly quotes a November 21, 2005
memorandum from defendant Clark Gates and a December 20, 2005 article from
the New York Post, indicating that the plaintiffs relied upon these materials
in bringing this suit.  The Court considers these documents incorporated by
reference into the Complaint.  See Cortec Indus., 949 F.2d at 47.

Participation Fund ("Non-Leveraged Fund") and the Centrix

Leveraged Loan Participation Fund ("Leveraged Fund") are

separate series of Centrix Funds (collectively, "the Funds").

(Id. ¶ 25.)

The defendant Centrix Capital Management, LLC ("Centrix

Capital") is a Colorado Limited Liability Company.  The

defendant Clark Gates is the President of Centrix Capital, which

is the managing member of both the Leveraged Fund and the Non-

Leveraged Fund.  (Id. ¶¶ 26–27.)

The defendant Cogent Investment Strategies Fund, Ltd., a

Cayman Islands company, sponsors the Centrix Leveraged Loan

Participation Portfolio (the "Portfolio") and is managed by the

defendant Cogent Asset Management, LLC.  (Id. ¶¶ 23–24.)  The

Portfolio was formed to invest in limited liability company

interests of the Leveraged Fund.  (Id. ¶ 64.)

Commencing in April 2004, Centrix Funds offered and sold

securities in the form of "interests" in the Non-Leveraged Fund

at a minimum purchase price of $1 million pursuant to a

Confidential Offering Memorandum ("Non-Leveraged COM").[2]  (Id. ¶

33.)  The Amended Complaint alleges that, in the Confidential

Offering Memorandum and other documents, the defendants

represented that the Non-Leveraged Fund's investment objective

---

[2] The Amended Complaint notes that the defendants issued other Non-Leveraged
COMs which were substantively identical in August 2004, October 2004, and
December 2004.  (Am. Compl. ¶ 33.)

was to achieve a targeted annual return of eight percent by
investing in a managed portfolio of insured sub-prime automobile
finance loans. (Id. ¶ 35.) Sub-prime loans are loans provided
to borrowers with weak credit histories or reduced payment
capacity and which therefore have higher interest rates and
higher delinquency rates than other loans. (See National Credit
Union Association ("NCUA") Letter No. 04-CU-13, Affadavit of
Arthur S. Linker dated March 30, 2007("Linker Aff."), Ex. E.)
The defendants also represented that the portfolio management
program had been viewed favorably by banks and credit unions,
that there had historically been an active secondary market of
financial institutions that buy and sell loans, and that Centrix
Financial had generally been able to arrange sales of loan
portfolios to meet the liquidity requirements of its customers.
(Am. Compl. ¶ 35.)

    Between July 2004 and May 2005, the plaintiffs invested a
total of $77,750,000 in the Non-Leveraged Fund. (Id. ¶¶ 34,
60.)

    In August 2005, one or more of the defendants offered
voting, redeemable, participating shares of Class C of the
Portfolio to the plaintiffs through a Private Placement
Memorandum and Confidential Offering Memorandum with a stated
minimum investment of $2.5 million. (Id. ¶¶ 63-64.) According
to these offering materials, the Portfolio was formed to invest

in the Leveraged Fund, which had as its investment objective
providing a targeted return by indirectly investing on a
leveraged basis in a managed portfolio of insured sub-prime
automobile finance loans. (Id. ¶¶ 68.) According to the
Amended Complaint, these offering materials, like the ones for
the Non-Leveraged Fund discussed above, represented that Centrix
Financial had generally been able to arrange sales of loan
portfolios to meet the liquidity requirement of customers and
that the plaintiffs' investments would be redeemed upon request
in accordance with the terms of the offering memoranda. (Id. ¶
68.) The Leveraged Fund managers also represented to the
plaintiffs that this fund would "indirectly invest, on a
leveraged basis" in the loans and that, until they could do so,
they would maintain any investments in liquid vehicles such as
money market funds and bank deposits. (Id. ¶ 70.)

Plaintiffs Edison Fund, Fairfax Fund, and Oxford Fund
collectively invested approximately $13 million in the Leveraged
Fund in August 2005. Oxford Fund's investment was transferred
from its initial investment in the Non-Leveraged Fund. (Id. ¶
66.)

Each of the plaintiffs directed KBC Financial or BNP
Paribas, to purchase ownership interests in the Leveraged Fund
or the Non-Leveraged Fund on its behalf. (Id. ¶ 32.)

In November 2001, the NCUA issued a letter urging due diligence review of "alternative financing" arrangements through third party providers such as subprime lending. (Linker Aff., Ex. D; Am. Compl. ¶ 41.) The letter also noted that such arrangements can lead to "growth, improved profitability, and strong member relationships." (Id.) In September 2004, the NCUA published a letter to federally insured credit unions addressing "safety and soundness concerns" about higher risk lending activities, including sub-prime lending.   The letter advised credit unions to engage in on-going monitoring and analysis of these higher risk activities and their potential impact on the lender's financial performance. (Linker Aff., Ex. E; Am. Compl. ¶ 42.)

In June 2005, the NCUA published a risk alert letter to credit unions warning them of its concerns because of a "sharp increase in the number of credit unions engaged in outsourced, indirect, subprime automobile lending."  (NCUA Risk Alert No. 05-Risk-01, dated June 2005, Linker Aff., Ex. F.)  The risk alert provided more detailed guidance on how to analyze the risk associated with these practices and it outlined sound business practices and minimum due diligence requirements that credit unions should follow to engage in sub-prime lending through third-party vendors.  (Id.)

In November 2005, the plaintiffs sought to redeem certain of their investments in the Leveraged and Non-Leveraged Funds. Centrix Capital announced by way of a memorandum dated November 21, 2005 and signed by Gates that it could not meet the large number of redemption requests on a timely basis and that it would liquidate the fund as of December 31, 2005 because of "unforeseen circumstances largely beyond the control of Centrix Capital Management, LLC," including "a change in credit union compliance guidelines set by the [NCUA]." (Decl. of Lance Gotthoffer dated May 8, 2007 ("Gotthoffer Decl"), Ex. E; Am. Compl. ¶ 80.)

The plaintiffs allege that the defendants knew or should have known about the NCUA's concerns about credit union involvement in sub-prime lending prior to the issuance of the first Non-Leveraged COM in April 2004. Further, because of the NCUA's risk alert of June 2005, the plaintiffs allege that the defendants knew or should have known that by June 2005 the secondary market was dead, but that the defendants did not disclose those concerns to the plaintiffs until after they had invested in the Leveraged Fund. (Am. Compl. ¶¶ 43-44, 55.)

On December 6, 2005, the defendants delivered to the plaintiffs a memorandum from Centrix Financial LLC, the parent of Centrix Capital, explaining the NCUA's risk alert letter of June 2005 and appending a copy of the risk alert itself. (Id. ¶

84; Gotthoffer Decl., Ex. I.)  The memorandum also explained
that over 100 credit unions had already been examined by the
NCUA and that Centrix Financial expected those credit unions to
be in compliance and to resume funding the Centrix program in
January 2006.  (Id.)

A New York Post article published December 20, 2005
reported that Centrix Capital was limiting customer withdrawals
from its Portfolio to keep institutional investors from "fleeing
the fund after it was hit with hundreds of millions of dollars
in client redemptions."  The article said that Centrix's assets
had gone from $700 million to $442 million because of the
withdrawals, and that Centrix had to ration withdrawals because
it did not "have liquidity in these [underlying sub-prime]
loans."  (Roddy Boyd, Hedge Clips Clients—Fund Cuts Withdrawals,
New York Post, Dec. 20, 2005, at 37, Linker Aff., Ex. H.)  The
article also reported that the fund should get its principal
back because the underlying loans are insured, and that the fund
had dropped 1.03% in August 2005 but was up 4.8% so far for the
year.  (Id.)

Gates sent a letter to the plaintiffs' representative on
December 27, 2005 offering the plaintiffs the option of
transferring their money into a new fund that had redemption
gates.  The plaintiffs rejected the proposal.  (Am. Compl. ¶
86.)

All of the plaintiffs except Oxford Fund and Nucleus Fund
sold their interests in the Funds in December 2005, incurring a
total loss of approximately $20 million.  Plaintiffs Oxford Fund
and Nucleus Fund continue to hold positions in the Funds, but at
a significant loss in value.  (Id. ¶ 93.)


## II.

The plaintiffs' first claim is for violations of Section
10(b) of the Securities Exchange Act of 1934, 18 U.S.C.
§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §
240.10b-5.  To state a claim pursuant to Section 10(b) and Rule
10b-5, the plaintiffs must sufficiently allege that "in
connection with the purchase or sale of securities, the
defendant[s], acting with scienter, made a false material
representation or omitted to disclose material information and
that the plaintiff[s'] reliance on defendant's action caused
[the plaintiff] injury."  AIG Global Sec. Lending Corp. v. Banc
of America Sec., LLC, 01 Civ. 11448, 2005 WL 2385854, at *8
(S.D.N.Y. Sept. 26, 2005) (quoting Rothman v. Gregor, 220 F.3d
81, 89 (2d Cir. 2000)).

The defendants argue that the plaintiffs have failed to
meet these pleading requirements with respect to the Non-
Leveraged and the Leveraged Fund in several respects, each of
which will be addressed in turn.

**A.**

The defendants argue that the Complaint does not plead the alleged fraudulent statements with sufficient particularity. Securities fraud claims are subject to the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

Rule 9(b) requires that the Complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  The PSLRA similarly requires that the Complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); see also ATSI Communications, 493 F.3d at 99.

**1.**

First, the defendants argue that the plaintiffs do not allege with particularity any facts sufficient to show that the Non-Leveraged COMs contained material misrepresentations or

12

omissions.  The plaintiffs' allegations of material
misrepresentation with regard to the Non-Leveraged Fund center
around four statements in the Non-Leveraged offering materials
that:

     (a)     [This fund would invest in a portfolio of insured
            special automobile loans by] directly funding
            Loans and by purchasing Loans from financial
            institutions.

     (b)     [The Portfolio Management Program…was] viewed
            favorably by banks and credit unions because it
            allows them to provide services and loans to
            customers who may not meet their more stringent
            regular credit guidelines.

     (c)     [T]here has historically been an active secondary
            market of financial institutions that buy and sell
            Loans.

     (d)     Centrix Financial has generally been able to
            arrange sales of loan portfolios to meet the
            liquidity requirements of customers.

(Am. Compl. ¶ 4, quoting Confidential Offering Memorandum dated
April 2004, Linker Decl., Ex. B.)

    The Amended Complaint alleges that the statements were
false and misleading because the defendants failed to disclose
(a) that the success of the Non-Leveraged Fund was wholly
dependent upon credit unions to originate, buy and sell loans;
(b) that no "banks" and no "financial institutions" other than
credit unions, funded, bought, or sold loans or loan portfolios
or were in any way involved with the Leveraged Fund; and (c)
that the defendants, through their superior knowledge of credit
union practices and regulations not available to the investing

public, knew from at least November 2001 that government
regulators were scrutinizing credit union involvement in such
subprime loans, and knew from at least March 2004 forward that
the government regulators' scrutiny had heightened and would
have the effect of eliminating whatever "historically active
secondary market" had existed.[3]  According to the plaintiffs,
this information should have led the defendants to conclude that
the investment yield targets and liquidity representations set
forth in the offering memoranda were impossible to achieve.
(Am. Compl. ¶ 5.) The plaintiffs also suggest that the
defendants had a duty to update the representations in the Non-
Leveraged COMs when they became aware that the credit union
market was troubled.

     The allegations with respect to the Non-Leveraged Fund
plainly meet the first three requirements under Rule 9(b).  The
Amended Complaint specifies the fraudulent statements,
identifies the speaker, and states where and when the statements
were made. (<u>See</u> Am. Compl. ¶¶ 4-5.)  However, the Amended
Complaint fails to explain sufficiently why the alleged
statements were fraudulent, as required by Rule 9(b) and the
PSLRA, both because the plaintiffs provide no factual basis for

---

[3] The plaintiffs contend that the NCUA's concerns about alternative lending practices that led to the September 2004 NCUA letter were based in part on economic data that was available as of March 31, 2004.  (Am. Comp. ¶ 42.) The Amended Complaint appears to allege that this data was available to the defendants "because of [Centrix Financial's] superior knowledge not available to the investing public" as of March 2004 as well.  (Am. Compl. ¶ 43.)

concluding that the allegations were fraudulent, and because the plaintiffs were adequately warned of risks under the 'bespeaks caution' doctrine.

### a.

The only alleged factual basis for why the Non-Leveraged COMs contained material misrepresentations consists of the NCUA letters sent in November 2001 and September 2004,[4] as well as certain portions of Robert Sutton's testimony on October 20, 2006 in the Centrix Financial Chapter 11 Bankruptcy proceeding.[5]

The NCUA communications in November 2001 and September 2004 do not support the plaintiffs' allegations that the Non-Leveraged COMs contained false statements or omissions of material facts with respect to whether credit unions provided a viable origination source for loans and a viable secondary market for loans. While the NCUA letters did caution credit unions to monitor their subprime lending relationships, the same

---

[4] The plaintiffs invested in the Non-Leveraged fund during a period beginning in July 2004 and continuing to June 1, 2005, when the plaintiff Edison Fund invested $5,000,000 in the Non-Leveraged Fund. (See Supplemental Decl. of Lance Gotthoffer, dated March 10, 2008, at ¶ 2.) The Defendants issued four substantively identical Non-Leveraged offering memoranda over this time. The second NCUA letter, dated September 2004, was issued after some of the plaintiffs initially invested in the Non-Leveraged Fund, but for the purposes of this opinion, both letters will be considered as relevant to the plaintiffs' investment in the Non-Leveraged Fund.

[5] Robert Sutton, the chairman and CEO of Defendant Centrix Capital Management testified at a Section 341 Meeting of Creditors on October 30, 2006 in the Chapter 11 bankruptcy of Centrix Financial, an alleged affiliate of the Funds which originated and services loans. (See Am. Compl. ¶¶ 8, 29, 30, 37-39; Goffhotter Decl., Ex. F.)

letters made note of the growth in such third-party lending arrangements and even made positive statements about them. For example, the November 2001 NCUA letter noted that third-party relationships can make programs more cost-effective, and lead to growth, improved profitability, and stronger member relationships. (NCUA Letter No. 01-CU-20, dated Nov. 2001, Linker Decl., Ex. D.) Similarly, the September 2004 NCUA letter stated that "sub-prime lending, indirect lending, and outsourced lending relationships . . . can make good strategic business sense for credit unions when done with proper care." (NCUA Letter No 04-CU-13, dated Sept. 2004, Linker Decl., Ex. E.) The letters certainly did not serve as a directive to credit unions to stop this type of lending.

The Amended Complaint also alleges that Robert Sutton's testimony in the bankruptcy proceeding reveals that the funds were wholly dependent upon credit unions, which is contrary to the representation in the offering memorandum that the loans were bought from and sold to banks. Sutton testified that only credit unions bought the loans, "because credit unions and banks are rather competitive, and they wanted to make this a credit union only product." (Am. Compl. ¶ 37.)

The plaintiffs have offered no basis to conclude that the COMs falsely represented that banks were available to provide liquidity to the Funds in order to meet redemption requests.

There is no discussion in the COMs that banks actually bought the loans or that the secondary market that provided security consisted of banks. The plaintiffs make much of the singular assertion in the April 2004 COM that "banks and credit unions" have looked favorably on the Centrix program, in view of the fact that the Centrix program was directed only to credit unions. (Linker Decl., Ex. B at 12.) The allegation is unpersuasive. The statement does not say that banks purchase loans from the Funds; rather it says that banks and credit unions view the Funds favorably because the banks and credit unions apparently can sell the loans to the Funds thus allowing the banks and credit unions to provide services to their customers who might not otherwise meet their credit requirements. That is the only reference to "banks" in the entire offering memo, while the Non-Leveraged COMs refer several times to the approval by credit unions. Indeed, the statement about "banks and credit unions" is followed by the statement that Centrix Financial Portfolio Management Program has been endorsed by over thirty-six state credit union leagues. Therefore, the Non-Leveraged COMs did not state or imply that the financial institution secondary market for loans included "banks."

With respect to whether any of the loans in the portfolio were originated by banks rather than credit unions or by Centrix

Financial, Sutton made it clear in his testimony that the
original intent was to purchase loans from banks as well as
credit unions but he was urged by credit unions not to do so.
(Gotthoffer Decl., Ex. F at 27-28.)  The COM made it clear that
the Funds' investment in loans generally would be accomplished
by directly funding loans and by purchasing loans from
"financial institutions."  (Linklater Decl., Ex B at 4.) The COM
also made it clear that the Fund's investment objective and
strategies may vary.  (Id. at 5.)  The single reference to
"banks" in the COM could not be viewed as a reference that the
Funds depended on banks as a source for the loans in the
portfolio.  In any event, any alleged damages suffered by the
plaintiffs were not caused by a lack of inventory of loans in
the portfolio, but by the alleged inability to sell the loans in
a secondary market and there is not a single reference in the
COM to banks providing a secondary market for loans in the
portfolio.

    In short, the plaintiffs allege no facts to show that when
the Non-Leveraged COMs were issued between July 2004 and May
2005 that the defendants had reason to believe that "the credit
union market was retrenching due to the NCUA's actions", or that
the plaintiffs were misled that the Funds depended on banks as
well as credit unions. (See Am. Compl. ¶ 45.) The plaintiffs'

allegations are insufficient to meet the rigorous requirements
of the PLSRA and Rule 9(b).

**b.**

Moreover, the defendants' offering materials contained
sufficient cautionary language to make the plaintiffs aware of
the risks involved in the Non-Leveraged Fund.  Under the
bespeaks caution doctrine, certain alleged misrepresentations in
a securities offering are "immaterial as a matter of law because
it cannot be said that any reasonable investor could consider
them important in light of adequate cautionary language set out
in the same offering." Halperin v. Ebanker USA.Com, Inc., 295
F.3d 352, 357 (2d Cir. 2002).  In order to ascertain whether a
reasonable investor would have been misled despite the presence
of cautionary language, courts are, first, to identify the
allegedly undisclosed risk, and second, to read the allegedly
fraudulent materials as a whole "to determine if a reasonable
investor could have been misled into thinking that the risk that
materialized and resulted in his loss did not actually exist."
Id at 359.

The Amended Complaint identifies the risk with respect to
the Non-Leveraged Fund as the Fund's inability to achieve yields
and meet redemption demands because of the absence of the
historic secondary market.

The Non-Leveraged offering materials made no blanket guarantees about the liquidity of the investments or the ease of redemption. In fact, the Non-Leveraged COM warned investors that the Funds were appropriate only for sophisticated investors and carried risks—in particular, risks of the illiquidity of the investments. For example, the offering materials for the Non-Leveraged Fund state that "[g]iven the relatively illiquid nature of the Loans, distributions will be made subject to sales of Loans and available cash in the Fund." (Linker Decl., Ex. B at 8.) They continue by warning:

> [T]here is no public market for such loans and sales of loan portfolios are private transactions arranged on a case-by-case basis. Accordingly, redemption of Interests by Members will be subject to the Fund's available cash flow from principal and interest payments and the ability, with the assistance of Centrix Financial, to sell the Loans to third parties.

(Linker Decl., Ex. B at 20.) The offering materials describe the risk profile of the Funds:

> An investment in the Fund is suitable only for sophisticated investors who are aware of, and can afford, the risks involved in an investment in the Fund and have the ability and willingness to accept (1) the illiquid nature of the investments in the Interests and (2) the risk of loss of a substantial portion of the Fund's capital.

(Linker Decl., Ex. B at 6.)

In light of this cautionary language, no reasonable investor could have concluded that the risks of the possible illiquidity of the investments and a risk of loss of capital due

to a number of factors, including the tightening of the secondary market, did not exist. The Non-Leveraged Fund was clearly for sophisticated buyers only and carried high risk—in particular the risk that redemptions would not be readily available on demand.

<strong>c.</strong>

The plaintiffs also suggest that when the viability of the credit union market began to erode, the defendants had a duty to update the Non-Leveraged COMs' representations by alerting the plaintiffs that the credit union market was troubled. "A duty to update may exist when a statement, reasonable at the time it was made, becomes misleading because of a subsequent event." In re Int'l Business Machines Corp. Securities Litigation, 163 F.3d 102, 110 (2d Cir. 1998). There is no duty to update when the statement that was made was not "forward looking and does not contain some factual representation that 'remains alive' in the minds of investors as a continuing representation." Id.

The plaintiffs allege no facts that would give rise to a duty to update prior opinions or projections in the Non-Leveraged COMs. The statements by the defendants about the historic secondary market did not amount to a forward looking factual representation. To the extent that the plaintiffs contend that the representations in the Non-Leveraged COMs of a historic secondary market became misleading after the June 2005

21

NCUA Risk Warning, the plaintiffs do not allege a proper claim under section 10b-5. The cases cited by the plaintiffs involved statements that were false at the time they were made, or involved events that gave rise to a duty to update prior representations which occurred before the plaintiffs purchased the securities at issue. See In re Time Warner, 9 F.3d 259, 267 (2d. Cir. 1993); Cosmas v. Hassett, 886 F.2d 8 (2d Cir. 1989); City of Sterling Heights Police and Fire Ret. Sys. v. Abbey Nat'l, PLC, 423 F.Supp. 2d 348, 360 (S.D.N.Y. 2006). All of the plaintiffs purchased their interests in the Non-Leveraged Fund prior to the June 2005 and NCUA Risk Warning and thus there could have been no duty to update the COMs on which they allegedly relied.

For all of these reasons, the plaintiffs fail to allege material misrepresentation with respect to the Non-leveraged Fund.

**2.**

With regard to the Leveraged Fund, the plaintiffs assert that the following statements in the Leveraged COM were false:

> (a) "the principal objective of the Leveraged Fund is to preserve capital and to seek to provide a targeted return in excess of the unleveraged returns of the Centrix Loan Participation Portfolio. . .by indirectly investing, on a leveraged basis, in a managed portfolio of insured special automobile finance loans";
> (b) to the extent assets of the [Leveraged] Fund cannot be invested in Loans, the Fund intends to and will invest

generally in money market funds, bank deposits and similar
investments"
(c) [in connection with the permitted withdrawals] there
has historically been an active secondary market of
financial institutions that buy and sell Loans.

(Am. Compl. ¶ 6, quoting Confidential Offering Memorandum dated

August 2005 ("the Leveraged COM"), Linker Decl., Ex. C.)

The plaintiffs allege that the representations in the

Leveraged COM were false for the reasons asserted with respect

to the Non-Leveraged COMs, and because the NCUA June 2005 Risk

Alert was issued two months before the Leveraged COM and the

time of some of the plaintiffs' subsequent purchases of the

Leveraged Fund.  The plaintiffs allege that the June 2005 Risk

Alert ordered all credit unions to cease and desist from

participating in subprime automobile lending, and that this fact

was not disclosed to the plaintiffs; had the effect of

terminating the market for loans; drove Centrix Financial LLC

out of business; and made it impossible for the fund to meet

yield projections or leverage loan portfolios and obtain

liquidity for withdrawals as claimed.  (Am. Compl. ¶ 7.)  The

plaintiffs also allege that the "Defendants further failed to

disclose that they did not intend to invest non-loan assets in

money market accounts, bank deposits, and similar investments,

but rather intended to use the proceeds to purchase non-

leveraged loans, prop up the failed market in such loans, and

further prop up their floundering servicing arm, Centrix Financial." (Id.)

The defendants claim that the plaintiffs fail to allege facts sufficient to show that the issuance of the NCUA Risk Alert in June 2005 rendered false the representations in the Leveraged COM concerning the availability of liquidity in the financial institution secondary market to fund redemption requests. They point out that the Leveraged COM contained the same cautionary language that was contained in the Non-Leveraged COMs concerning the illiquid nature of the loans and the illiquid nature of interests in the Funds, and warned that there could be no assurance that loans could be sold successfully in the secondary market if liquidity were needed.

In light of the June 2005 risk alert, however, the plaintiffs have satisfied the requirements of Rule 9(b) and the PSLRA with respect to pleading the material misrepresentations made in connection with the Leveraged Fund. Unlike the November 2001 and September 2004 NCUA communications, the June 2005 risk alert appeared to require corrective action. The risk alert was apparently the first issued in the history of the NCUA. (Am. Compl. ¶ 73.) The language was significantly sharper and more direct: for example, the alert stated, "We have a heightened concern that credit unions engaged in [outsourced, indirect, subprime automobile] lending may not have effective controls and

24

monitoring systems in place." (See Linker Aff., Ex. E.) The Risk
Alert emphasized that subprime lending carries higher credit
risk because subprime loans have a historically higher default
rate.  It listed six areas of concern in connection with
subprime lending, emphasized sound business practices, and
warned that "failure to implement effective controls and
monitoring systems will result in frequent supervisory contacts
and may result in other appropriate administrative actions."
(Id.)  For example, while the September 2004 NCUA letter
emphasized the importance of sound underwriting practices,
effective control and monitoring systems, and sufficient capital
levels, the risk alert went a step further and pointed out that
"some credit unions are employing underwriting practices
established for third-party underwriters without first ensuring
that those practices are sound for their credit unions."

    The August 2005 COM contained substantially similar
language to the previous COMs, but the risk had apparently
changed in light of the June 2005 risk alert.  Robert Sutton's
testimony characterizing the June 2005 Risk Alert as a "great
thud" that "had the effect of chilling the market place,"
further supports the plaintiffs' claim that the defendants were
aware of the implications of the risk alert. (Am. Compl. ¶ 75.)

    The 'bespeaks caution' doctrine does not insulate the
defendants here. The plaintiffs identify the risk allegedly

concealed in the Leveraged COM as the fact that the issuance of the NCUA Risk Alert in June 2005 caused the representations in the Leveraged COM concerning the availability of liquidity in the financial institution secondary market to fund redemption requests to be false. The bespeaks caution doctrine does not apply where the specific risk is apparent and not disclosed. If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability. Indeed, "the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts." Rubinstein v. Collins, 20 F.3d 160, 171 (5th Cir 1996); see also In re Apple Computer Sec. Litig., 886 F.2d 1109, 1115 (9th Cir. 1989); In re Credit Suisse First Boston Corp. Securities Litigation, No. 97 Civ. 4760, 1998 WL 734365, at *7 (S.D.N.Y. Oct. 20, 1998); In re Prudential Sec. Inc. Ltd. Partnership Litig., 930 F.Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."). Therefore, the plaintiffs have pleaded material misrepresentations with respect to the Leveraged Fund.

**B.**

The defendants also argue that the Amended Complaint fails to allege that the defendants acted with the "scienter" necessary to support a Rule 10b-5 claim. The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." AIG Global Sec., 2005 WL 2385854 at *8 (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996)). The PSLRA requires that a complaint alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Communications, 493 F.3d at 99. Further, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing references." Tellabs v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2509 (2007). A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts

alleged." Id. at 2510; see also ATSI Communications, Inc., 493
F.3d at 99.

The plaintiffs allege that the defendants engaged in
conscious behavior with respect to the alleged
misrepresentations in the COMs.  According to the plaintiffs,
based upon Sutton's communications with credit unions, the NCUA
letters, the cited testimony of Sutton and statements of Gates,
and the motive to receive management fees regardless of the
performance of the Funds, each defendant was aware of the
fraudulent misrepresentations and omissions contained in the
COMs. (See Am. Compl. ¶¶ 2, 5, 7, 8, 39-62, 68.)  The plaintiffs
further allege that the defendants had a pecuniary motive to
misrepresent the Funds' prospects in order to earn large
management fees and to create a market beyond the collapsing
credit union market to salvage Centrix Financial.  (Am. Compl.
¶¶ 56, 71, 75-76.) Finally, the plaintiffs assert that the
defendants demonstrated recklessness because they knew facts
that were not public regarding the NCUA, and had a close
relationship with credit unions, and thus knew or should have
known they were misrepresenting material facts with respect to
the historic secondary market. (Am. Compl. ¶¶ 37, 39, 46, 55.)

The plaintiffs' allegations of scienter will be considered
as they relate to two time periods: (1) April 2004 through June
1, 2005, when the plaintiffs invested in the Non-Leveraged Fund

in reliance on the Non-Leveraged COMs, and (2) August 2005, when some of the plaintiffs invested in the Leveraged Fund in reliance on the Leveraged COM.

**1.**

The plaintiffs do not sufficiently plead scienter with respect to the Non-Leveraged Fund. The plaintiffs' attempt to plead motive and opportunity lacks specific factual support. The Amended Complaint states: "despite the fact that Defendants knew and failed to disclose that the Non-Leveraged Fund could not meet yield targets and was illiquid, the Non-Leveraged Fund paid the manager and managing member Defendants extraordinarily high management fees regardless of the Non-leveraged Fund's performance." (Am. Compl. ¶ 56.) Motive may be pleaded adequately where the defendants are alleged to have benefited in "some concrete and personal way." Kalnik v. Eichner, 264 F.3d 131, 139-40 (2d Cir. 2001); see also In re Scottish Re Group Securities Litigation, 524 F.Supp.2d 370, 393 n.171 (S.D.N.Y. 2007); In re Loral Space & Commc'ns Ltd. Sec. Litig., 01 Civ. 4388, 2004 WL 376442, at *6 (S.D.N.Y. Feb. 27, 2004). However, apart from this conclusory statement of the defendants' motive to take the plaintiffs' money, the factual allegations in the Amended Complaint do not support a theory of concrete and personal benefit from the alleged fraud. The desire to earn

management fees is a motive generally possessed by hedge fund
managers, and as such, does not suffice to allege a "concrete
and personal benefit" resulting from fraud.  See Kalnit, 264
F.3d at 139.  To accept a generalized allegation of motive based
on a desire to continue to obtain management fees would read the
scienter requirement out of the statute.  Even assuming
opportunity existed, the Amended Complaint fails to allege
motive sufficiently to give rise to a "strong inference" of
scienter.

    The Complaint similarly fails to allege sufficient facts to
constitute strong circumstantial evidence of conscious
misbehavior or recklessness.  Complaints typically suffice to
plead scienter on the basis of recklessness when they
"specifically allege[] defendants' knowledge of facts or access
to information contradicting their public statements."  Novak v
Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).  However, "allegations
that defendants should have anticipated future events and made
certain disclosures earlier than they actually did do not
suffice to make out a claim of securities fraud."  Id. at 309.
As discussed above, the plaintiffs' allegations concerning the
NCUA letters do not suffice to suggest that the defendants had
information contradicting the representations they made in the
offering materials for the Non-Leveraged Fund.  The Amended
Complaint instead assumes that the defendants should have

anticipated future difficulty in the market for sub-prime automobile loans, and this sort of "fraud by hindsight" allegation cannot survive a motion to dismiss.  See Id.

The claim with respect to the Non-Leveraged Fund thus fails to allege particular facts giving rise to a strong inference of scienter, as required by the PLSRA.

**2.**

The plaintiffs do, however, plead scienter with respect to certain of the defendants in connection with the Leveraged Fund.

At the outset, the plaintiffs allege no facts pertaining specifically to Cogent Asset Management that show either motive and opportunity or conscious behavior or recklessness in order to satisfy the scienter requirement.  Cogent Asset Management managed Cogent Investment Fund, which invested in Centrix Funds. The plaintiffs do not allege that Cogent Asset Management played a role in the management of either Centrix Financial or the Funds.  The plaintiffs cannot automatically impute scienter on the basis of conclusory statements of associations, and must "state with particularity facts giving rise to 'a strong inference' that each defendant acted with scienter." See Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of America Securities, LLC, 446 F.Supp.2d 163, 187 & nn.166, 167 (S.D.N.Y. 2006).

Assuming that the plaintiffs could establish that Cogent Asset Management had opportunity to commit the alleged fraud, the plaintiffs cannot establish motive. The only facts alleged to support the allegation of motive are that the Leveraged COM was issued in order to gain capital from investors to try to salvage Centrix Financial even though there was no market, and that Cogent Asset Management was interested in earning high management fees through the funds, which were mere artifices. The motives to obscure one financial institution's deteriorating financial position in order to salvage another dependent financial institution, and in order to continue to obtain high management fees, are the type of generalized motives that the Court of Appeals has concluded do not suffice to establish scienter, because they could be imputed to any for-profit endeavor. Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996); see also In re Loral Space & Comm'ns Ltd. Secs. Lit., No. 01 Civ. 4388 2004 WL 376442, at * 8 (S.D.N.Y. Feb. 27, 2004). The plaintiffs' allegations of motive with regard to the remaining defendants similarly do not extend beyond generalized motives.[6]

On the other hand, the plaintiffs properly allege facts that point to strong circumstantial evidence of recklessness by

---

[6] The defendants have only made a particularized argument regarding the lack of scienter with respect to the defendants Cogent Asset Management and Gates. (Def. Mem. at 19.)

Gates and the remaining Funds based upon the June 2005 Risk Alert and Robert Sutton's testimony. "Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." In Re Scholastic Corp., 252 F.3d 63, 76 (2d Cir. 2001), quoting Novak, 216 F.3d at 308. According to Robert Sutton's testimony, the June 2005 Risk Alert hit with a "great thud." The plaintiffs allege that Sutton was the Chief Executive Officer of defendant Centrix Capital Management and the ultimate owner of all of the funds, and that he had knowledge of, and access to, the information relating to the NCUA and the credit unions. Unlike Cogent Asset Management, which was one step removed, the plaintiffs have properly alleged that the remainder of the defendants are closely connected such that they would have had access to the information from the NCUA. Moreover, the plaintiffs cite a letter signed by Gates in November 2005 stating that redemptions were being suspended on the basis of "unforeseen circumstances" including a "change in credit union compliance guidelines" set by the NCUA. Gates apparently had access to non-public information involving credit unions, because the June 2005 Risk Alert was not made available to the plaintiffs until December 2005.

Gates and the Funds allegedly had access to non-public information when they received the June 2005 risk alert from the NCUA.  The representation in the Leveraged COM that the market was substantially the same as it was in the Non-Leveraged COMs was, at the very least, reckless.

Thus, with the exception of Defendant Cogent Asset Management, the plaintiffs have pleaded scienter with respect to the Leveraged Fund.

### C.

The defendants also contend that the plaintiffs fail to plead "loss causation"—that is, "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (internal citation omitted).  The loss causation requirement is codified by the PLSRA, which provides: "[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  Alleging an artificially inflated purchase price as a result of a misrepresentation is not sufficient to fulfill this requirement; the plaintiff must prove that the misrepresentation proximately caused the economic loss.  Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346

(2005).  To allege loss causation, "a plaintiff must
allege . . . that the <u>subject</u> of the fraudulent statement or
omission was the cause of the actual loss suffered, i.e., that
the misstatement or omission concealed something from the market
that, when disclosed, negatively affected the value of the
security."  <u>Lentell</u>, 396 F.3d at 173 (internal citation and
quotation marks omitted).

**1.**

The plaintiffs do not properly allege loss causation with
respect to the Non-Leveraged Fund.  The allegation that "had
Plaintiffs been aware of the true facts Plaintiffs would not
have invested in the Funds" (Am. Compl. ¶ 93) does not suffice,
because the plaintiffs have failed to identify a material
misrepresentation which could have caused the loss for which
they seek to recover damages.  Because the plaintiffs did not
invest in the Non-Leveraged Fund on the basis of a material
misstatement or omission in the Non-Leveraged COMs, they cannot
allege that there was a misstatement or omission which, when
disclosed, caused their loss.

The mere allegation that the plaintiffs received a lower
price when they sold their investments is not sufficient to
plead loss causation.  <u>See</u> <u>Dura</u>, 544 U.S. at 342-43 (noting that
a "lower price may reflect, not the earlier misrepresentation,
but changed economic circumstances, changed investor

expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.") Therefore, the plaintiffs fail to allege loss causation with respect to the Non-Leveraged Fund.

### 2.

The plaintiffs do allege loss causation with respect to the Leveraged Fund.  The plaintiffs allege that as a result of the June 2005 Risk Alert, the defendants knew or should of known that the market for credit unions was in danger, and their failure to disclose this to the plaintiffs in the Leveraged-COM caused the plaintiffs to invest in the Fund where they otherwise would have not. (Am. Compl. ¶ 93.) When the true facts came to light, it was apparent that the secondary market had dried up, the Leveraged Fund lost its access and liquidity and the participants in the Leveraged Fund could not redeem their shares.  This reduced the value of the Leveraged Fund shares, and the plaintiffs ultimately sold their interests at a substantial loss. (Am. Compl. ¶ 94.) The plaintiffs therefore have alleged that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.  See Lentell, 306 F.3d at 173.

For all of these reasons, the defendants' motion to dismiss is granted with respect to the Non-Leveraged Fund and denied with respect to the Leveraged Fund.

### III.

The plaintiffs' second claim alleges that defendants Centrix Capital Management, Cogent Asset Management, and Clark Gates are liable as controlling persons under Section 20(a) of the Securities Exchange Act.  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  The Court of Appeals has explained that "[i]n order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation."  Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)).

The Amended Complaint alleges that as a managing member, manager, and/or president of the Funds, the Defendants Centrix Capital Management, Cogent Asset Management, and Clark Gates possessed the power to direct or cause the direction of the management and policies of Funds, exercised control over the operations of the Funds, and possessed the power to control the Funds in the perpetration of the fraud on the plaintiffs. Because the plaintiffs have failed to state a claim pursuant to section 10(b) and Rule 10b-5 with respect to the Non-Leveraged Fund, the plaintiffs cannot sufficiently plead the "primary violation" element of the claim with respect to the Non-Leveraged Fund.

As for the Leveraged Fund, the defendants do not contest that the plaintiffs have sufficiently pleaded the first two elements of control person liability, but assert that the plaintiffs have failed to plead that the named defendants were culpable participants in the fraud.

District courts in this Circuit are divided over whether a plaintiff is required to allege that a controlling person was a culpable participant in the fraud as part of the prima facie case, or whether section 20(a) created a burden shifting framework where plaintiffs are only required to plead a primary section 10(b) violation and control, and defendants may raise a good faith defense in their answer that plaintiffs may later

rebut.  Thus, some courts view the pleading burden for a 20(a)

claim more akin to pleading Section 10(b) scienter, while other

courts find that a plaintiff need allege no more than control

status in order to survive a motion to dismiss a 20(b) claim.

Compare Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221,

244-45 (S.D.N.Y. 2006) (discussing the division and following

cases holding that 'culpable participation' is a pleading

requirement to state a section 20(a) claim and must be pleaded

with the same particularity as scienter under 10(b)), and In re

Parmalat Securities Litigation, 474 F. Supp. 2d 547, 554

(S.D.N.Y. 2006) ("Requiring a plaintiff to plead and prove not

only that the defendant controlled the person liable under the

chapter, but also that the defendant had exercised control over

the transaction constituting the violation, would be in serious

tension and probably inconsistent with the language of the

statute.").

    It is unnecessary to repeat all of the well-reasoned

arguments in the numerous other cases in this District.  The

weight of well-reasoned authority is that to withstand a motion

to dismiss a section 20(a) controlling person liability claim, a

plaintiff must allege "some level of culpable participation at

least approximating recklessness in the section 10(b) context."

Lapin, 506 F. Supp. 2d at 248.  Any other result would seem to

be at odds with the Court of Appeals' requirement that prima

facie liability under section 20(a) requires that "the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." See SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).

As discussed above in connection with the Section 10(b) claims, the plaintiffs sufficiently alleged scienter with respect to Gates and Centrix Capital Management, and thus the plaintiffs have alleged sufficient facts demonstrating the culpable participation of Gates and Centrix Capital Management in the alleged violations.

However, the plaintiffs have failed to allege scienter with respect to Cogent Asset Management, and similarly, do not allege particularized facts as to Cogent Asset Management's participation in the fraud.  The Amended Complaint alleges control over the operations of the Funds (Am. Compl. ¶ 104), but only alleges Cogent Asset Management's culpability in the most general of terms (Am. Compl. ¶ 105).  While the Amended Complaint alleges that Cogent Asset Management was "intentionally and/or recklessly" liable for the Funds' conduct, it pleads no facts that would give rise to a showing of recklessness or intention on behalf of Cogent Asset Management. Accordingly, the claims for Section 20(a) liability are **dismissed** as pertain to Cogent Asset Management.

**IV.**

The plaintiffs also assert state law claims for fraud and for gross negligence under New York and/or Colorado law. Because the purported jurisdiction over the state law claims is based on supplemental jurisdiction, the choice of law rules of the forum state apply. Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989). Under New York's choice of law rules, "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved. GlobalNet Financial Com, Inc. v. Frank Crystal & Co., Inc., 449 F.3d 377, 372 (2d Cir. 2006). An actual conflict exists "where the applicable law from each jurisdiction provides different substantive rules." IBM v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004). The proper law to be applied, and the defendant's motion to dismiss, will be considered as it applies to each of the state claims.

**A.**

There is no substantive conflict between the state laws that govern common law fraud in New York and Colorado. Compare S.E. Colo. Water Conservancy Dist. v. Cache Creek Mining Trust, 854 P.2d 167, 172 (Colo. 1993) (en banc) (stating elements of fraud under Colorado law), with AUSA Life Ins. Co. v. Ernst and Young, 206 F.3d 202, 208 (2d Cir. 2000)(stating elements of

fraud under New York law).  Where there is no conflict between

the law of New York and another jurisdiction, the court may

dispense with the choice-of-law analysis and apply New York law.

See, e.g., Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998)

(citing J. Aron & Co. v. Chown, 231 A.D.2d 426, 647 N.Y.S.2d 8,

8 (App. Div. 1996)).

      To state a claim for fraud under New York law, the

plaintiff must allege: (1) a misrepresentation or a material

omission of fact which was false and known to be false by the

defendant, (2) made for the purpose of inducing the other party

to rely upon it, (3) justifiable reliance of the other party on

the misrepresentation or material omission, and (4) injury.

AUSA Life Ins. Co., 206 F.3d at 208.  Common law fraud claims

also must satisfy the pleading with particularity requirement of

Rule 9(b).  Accordingly, a plaintiff must allege facts that give

rise to a strong inference of fraudulent intent. Id.

      For the reasons explained above, with respect to Section

10(b) and Rule 10b-5, the alleged misrepresentations by the

plaintiffs in the Amended Complaint with respect to the

Leveraged Fund survive, but the claims with respect to the Non-

Leveraged Fund do not and those claims must therefore be

dismissed.  See Rich v. Maidstone Fin., Inc. No. 98 Civ. 2569,

2002 WL 31867724, at *13 (S.D.N.Y. Dec. 20, 2002)(noting that

"[b]ecause [the elements of common law fraud] are substantially

identical to those governing § 10(b), the identical analysis applies.") (internal citation omitted); see also Marcus v. Frome, 329 F. Supp.2d 464, 475 (S.D.N.Y. 2004). Accordingly, the plaintiffs' allegations with respect to fraud in connection with the Leveraged Fund survive the defendants' motion to dismiss except as to defendant Cogent Asset Management, but the plaintiffs' allegations of fraud with respect to the Non-Leveraged Fund are dismissed.

**B.**

There appears to be a conflict between New York and Colorado state law on negligent misrepresentation. New York law requires a plaintiff to allege: "(1) carelessness in imparting words (2) upon which others were expected to rely (3) upon which they did act or failed to act (4) to their damage." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 788 (2d Cir. 2003). Additionally, (5) "the declarant must express the words directly, with knowledge or notice they will be acted upon, to one to whom the declarant is bound by some relation or duty of care." Id. It is well established that plaintiffs must allege the existence of a "special relationship" with the defendants in order to state a claim. See, e.g., ABF Capital Mgmt. v. Askin Capital Mgmt., 957 F.Supp. 1308, 1333 (S.D.N.Y. 1997) (dismissing investors negligent misrepresentation claim against

hedge fund investment advisor because of failure to plead "special relationship").

Colorado law defines negligent misrepresentation according to section 552 of the Restatement (Second) of Torts (1977), and requires a plaintiff to show that "the defendant supplied false information to others in a business transaction, and failed to exercise reasonable care or competence in obtaining or communicating information on which other parties justifiably relied."  Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, 892 P.2d 230, 236 (Colo. 1995).  Colorado courts impose an additional "third party" requirement that defendants may only be held liable for negligent misrepresentation if they supplied the offending information for use in a transaction not involving them.  Colorado Nat'l Bank v. Adventura Assoc., L.P., 757 F. Supp. 1167, 1172 (D. Colo. 1991).[7]

The Amended Complaint states, and the parties did not dispute at argument, that "most, if not all material acts of wrongdoing by Defendants, took place in the state of Colorado or a jurisdiction other than the state of New York." (Am. Compl. ¶

---

[7] This "third party" requirement was first articulated in Colorado Nat'l Bank and has been followed by other district courts applying Colorado law, and implicitly approved by the Colorado Court of Appeals.  See Grubka v. Webaccess Int'l, Inc., 445 F. Supp. 2d 1259, 1270 (D. Colo. 2006); Snoey v. Advanced Forming Tech., 844 F.Supp 1394, 1400 (D. Colo. 1994); but see Williams Field Servs. Group LLC v. Gen. Elec. Int'l Inc., No. 06 Civ. 530, 2008 WL 450374, at * 6 (N.D. Okla. Feb. 15, 2008) (applying Colorado law but declining to follow Colorado Nat'l Bank because finding that plain language of section 552(1) does not state that a third party is a necessary element to state a negligent misrepresentation claim).

115.) Other jurisdictions have a potential interest in the transactions at issue. For example, each of the plaintiffs is formed and has its principal place of business in the Grand Cayman Islands. However, the plaintiffs have only asserted their claims of negligent misrepresentation under the laws of Colorado or New York and the parties have only briefed the laws of Colorado and New York. See Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 53 (2d Cir. 1984) ("[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied."). The Court can accept the stipulation that the law to be applied is the law of either New York or Colorado because the plaintiffs have failed to state a claim under the laws of either jurisdiction.

Although the plaintiffs allege that the defendants made misrepresentations and omissions without any reasonable grounds for believing them to be true, and that in actual and justifiable reliance upon the defendants' misrepresentations and omissions the plaintiffs were induced to purchase and hold positions in the Funds, the plaintiffs do not allege that the defendants gave information to the plaintiffs for use in a business transaction with a third party and so the claim cannot survive under Colorado law. The claim also fails under New York law because the plaintiffs have failed to allege a special

45

relationship between the defendants and the plaintiffs.  See, e.g., ABF Capital Mgmt., 957 F. Supp. at 1333.  The motion to dismiss the claim for negligent misrepresentation is **granted**.

## CONCLUSION

The Court has carefully considered the remaining arguments and found them to be either moot or without merit.  For the reasons stated above, the motion for summary judgment (doc. #29) is **granted in part** and **denied in part**.  The plaintiffs' claims with respect to liability under Section 10(b) and Rule 10b-5, and for fraud with respect to the Non-Leveraged Fund are **dismissed**, and with respect to the Leveraged Fund are dismissed as to the defendant Cogent Asset Management.  The plaintiffs' claims for Controlling Person liability are **dismissed** as to the defendant Cogent Asset Management.  The plaintiffs' claims for gross negligence are **dismissed**.  The defendants' motion to dismiss the remaining claims is **denied**. The clerk is directed to close docket #29.

**SO ORDERED.**

Dated:    New York, New York
          March 31, 2008

_____
                John G. Koeltl
          United States District Judge